We're going to call our first case, Real Alternatives Inc v. Secretary Dept of Health and Human Services, Mr. Bowman. Good morning and may it please the court. My name is Matt Bowman and I represent Real Alternatives Inc. I'd like to reserve three minutes of my time for this morning. Real Alternatives Inc. is a small non-profit organization that promotes alternatives to abortion and certain drug control items. The government mandated that they cover several of these items in their health insurance plan, even though the government admits that exempting people who oppose the item, quote, does not undermine the governmental interests, unquote. Therefore, imposing a mandate on Real Alternatives Inc. has no rational basis. Okay, why don't we direct you, if I could, to answer the government's argument on pages 12 and 13 of its answering brief. Let me pick it up in their brief, too. In essence, as I understand it, it says there is a rational basis. It's deeply rooted in our nation's history. There are religious bodies, houses of worship. That's what the First Amendment protection for free exercise was designed to protect, not people who have a generalized moral feeling one way or another. In fact, if you ignore that distinction, you open up a Pandora's box where everybody can come in and say, I feel strongly, and then exceptions swallow the rule. I've probably not done justice to the more articulate framing which they gave to it, but that's what I take their argument to be. You need to grapple with that. Why are they wrong about that? Why is that not a rational basis? Well, they're wrong for two reasons, John. The first is that they're mistaking the basis for the exemption with the basis for the underlying rule. So what the Seventh Circuit pointed out in its kind of brinkly case was, you don't just look at the abstract notion of can we give benefits to religious groups or not. You look at the underlying rule and say, what are the interests of the government advancing in this rule, and does the exemption fit that? And so what the reason— I'm sorry, but I'm not getting how this is responsive to the question I just tried to ask. You've said there's no rational basis for them to treat us differently. I've just described for you what I understand their assertion to be the rational basis is. Why is that not a rational basis? Well, I didn't say there's no rational basis. The government said that. The government said when you impose this mandate on people who oppose it, it doesn't advance—it does not undermine the governmental interest to exempt those kinds of people. You're still not answering the question. Yeah. I apologize, Ron. I'm trying to answer the question. Well, it has to do with religion and the respect that historically in our country we have held out for religion and the distinction that we have with the Seventh Circuit is that there it pretty much was aligned with a system of beliefs. I mean, even Buddhists weren't going to be allowed under the statute. So here, would you answer Judge Jordan's question? Do you not acknowledge that there is a rational basis for the respect for religion? There is a rational basis for the respect for religion. Okay. And how there is a slippery slope if we say, oh, it's really just not about religion. That's about moral beliefs and philosophy and one attribute, as Judge Leone would have. That goes beyond what we're talking about, the rational basis for religion. Do you agree? Yes, but the problem is that the distinction in this case isn't just about religion in the abstract. It's about whether religion can be exempt from this particular mandate. And in this particular mandate, the government says it only helps people. How can we limit it to this particular mandate in the way you're describing it? The Miki make a point that you really should. I mean, they're a little more specific about it than the government. So let me direct you to page 18 of their brief and 17 of their brief. They say, if fervency of desire for an exemption alone were sufficient to confer equal protection, then merely asserting an equal protection challenge would create an absolute legal entitlement to be treated like a church. And then they go through and say, you know, they list a bunch of well-known nonprofits and say, they could all say, hey, give us an exemption from ERISA protections because you give it to churches. And we've got, you know, we've got strongly held beliefs, too. That reasoning, how is that – I mean, slippery slope arguments get made all the time. Sometimes they're persuasive, sometimes less so. Why should this one not persuade us? Here's the limiting principle that prevents the case from going down that slippery slope. We're not saying that fervency of belief allows a group, a secular group, to the same exemption as a religious group. What we're saying is that if you have the fervency of belief and you have the fact that exempting this secular group by the government's own admission will not undermine any government interest, that's the government's admission. So you have the combination of these parable beliefs plus the government saying, it won't hurt us at all as the government to exempt the secular people alongside the religious. Well, that's – okay. If that's where you're planting your flag, then you've got to address what they're – what I expect to hear from them in return, what I read in their briefing, which is that argument's just not so. You're taking down a straw man. Their government's position seems to be – and I'm going to ask them this – their compelling interest assertion is, when you get into that part, is that we want a universal system of insurance. And the more exemptions you get, the more difficult it is to administer that. In fact, it becomes practically impossible. I take that to be their argument for why there is something that's going to be affected, an interest they're posing to us. Why is that wrong? Well, that would be plausible if the regulations had not contradicted that description already. Because under the regulations, the government said, it does not undermine the governmental interest furthered by the contraceptive coverage requirement. Unquote, this is 78th Federal Rate, 39874. Does not undermine. What does not undermine? Certain specific exemptions, correct? Exempting groups whose employees likely oppose the items anyway. Well, isn't that slightly different? I mean, the slippery slope I'm concerned about is that if the individuals are – the individuals have real alternatives as an employer here. Suppose the employer were different and the individuals were making the claims themselves, right? Having seen that the individuals here are successful, individuals at, you know, every Fortune 500 company say, we also agree that our religious beliefs don't allow us to have health care plans that carry us. Isn't that problematic? And isn't that what we're really trying to get to with regard to the rational basis? Yes, and those employees' claims would fail. Because at those companies, those aren't companies where you only hire people who oppose, who work in a nonprofit situation opposing these items. And they have a right to only hire those people, and that's what Real Alternatives does. So the government has an interest in a Fortune 500 company saying, look, there are all kinds of employees there. Some might oppose it, some might not. We need to protect the people who don't oppose it, and the business doesn't oppose it at all, and that's not what they're in business for. You just said those employees' assertion would fail. I take it, I'm a little surprised at that because we've got two claims in front of us. We've got Real Alternatives and we've got the individual employees. You're not meaning to give away the individual employees' arguments here by that last statement, are you? No, Your Honor. What I'm saying is that our employees' claim under the Religious Freedom Restoration Act is also much stronger than the one of just the small group of employees at some company. Why? Why on earth would you suggest to us that because people choose to work for you, their religious interest, because for them it's a religious interest. It's a straight-up RFRA claim. Why is their religious interest any better or different than somebody that works for GE or for, you know, SmithKline Beecham or for some other giant multinational? If I've got a religious belief and it's truly held, why does the fact that I choose to work for a nonprofit make me a better, more religious person, better entitled to protection of the RFRA law than somebody who works for a big company? It's not that their religious interests are better. It's that the government interest can outweigh under the RFRA test. So the government has an interest in a company that hires all kinds of people to say, look, some of these people, they want this contraceptive coverage, we're going to give it to them. I mean, you contend that that's the government interest in terms of the employees, but the government contends that the workable system is their interest. So, I mean, if you adopt, you know, your own view of the government interest, that's one thing, but their interest is the workability of insurance. That's universal. That applies whether it's your company or anybody else, isn't it? Yeah, and I'd like to address that because having abandoned the idea that giving contraception to people who don't want it would advance the government interest, they've fallen back to this notion that if we give anyone exemptions, the insurance system will come crashing down. And that interest is just implausible on its face by the fact that they just gave a bunch of exemptions. But they're limited. If we expanded that everyone with a moral belief, you know, is exempt, then it will undermine it totally. Well, I don't agree, Your Honor, because we are talking about And there's also no basis for moral belief as compared to religion in terms of the rationality. Well, my clients disagree as a question of religion and morality, but there is a basis because we're talking about a company who the only people who work here and who will ever work here oppose these items on principle and will never use them. And when the government has said in that kind of population of people, it does not undermine our interest. So that means that the distinction you want us to draw is, if your employer requires you to have a particular moral or religious belief that falls under the protection of the act, then fine. But if you are an employee whose employer doesn't do that, a la the Fortune 500, those employees, based on the distinction you're drawing, would have no claim. So the individual employees would stand in contradistinction to yours based on what their employer requires. To be very precise, they would be able to make a claim that they would fail the compelling interest test. And the reason is that the employer has the First Amendment right to impose that obligation in a nonprofit advocacy context, not in a context where the- I got to interrupt you, and I apologize. Go ahead and finish your answer to Judge Greenway's question. So in the RFRA context, anyone can make a claim, and they might be able to have asserted a religious belief, but the government's interest might be more or less compelling on the back side of the test. What we're saying here is the government can't satisfy that interest with respect to my individual employee clients because they said it doesn't undermine their interest at all. Hold on. Now you're into a repetition, and I will interrupt you, and I'll ask my colleagues to indulge me. Because you're making an argument now which is not in your briefs and which, frankly, is pretty surprising to me. There are two different claims being made here, as I understand them. One of them is the protection claim with APA arguments added onto it with respect to real alternatives. The second is claims made under RFRA by your individual clients. Now, is it really- is the position you're taking honestly- and it may be that you're saying things that are meant to- that are bleeding over from one end to the other, and that's what's confusing me. But are you really suggesting that an employee- and I'm just picking a name out of the air. General Electric employee comes in and says, I'm not going to accept the health care offered to me by my company because it's got a contraception component to it. I have a sincerely held belief that that involves fortification to take into human life. I can't be a party to or participate in that pool. I don't want to. I decline that coverage. I'm going to go out on the individual market and look for insurance on my own. And I want a plan that doesn't have it. The government's regulations are preventing that kind of plan from being offered. That is a violation of my rights under RFRA, that government action. Are you- is your position that that argument is less credible coming from that employee because they work for GE than it is coming from an employee of Real Alternatives? No, Your Honor. It's distinct from that. It's because that person first- the plan they're getting from GE isn't the government's fault. So you have a- Yeah. And they've taken themselves out of it. In my hypothetical, they've taken themselves out of it. Now they're out on the individual market. That's their lawsuit. Are you saying their claim is less worthy of credence or that it has less persuasive force than the same argument that- because I understand that's your- excuse me- your individual client's argument. Maybe I've misunderstood, but I've tried to take your individual client's argument and frame it as coming from the mouth of a GE employee. Are you saying that that argument's less persuasive if it comes out of the mouth of somebody who gets their paycheck from GE than from Real Alternatives? Not in the aspect in which you're saying. They don't- their religious claims aren't wrong, but there are a bunch of obstacles that you have to satisfy before you actually win the claim. Let's say you have five hurdles to jump over. They're going to- our clients can jump over the front end of those hurdles because they've proven that they have- there's someone who will sell them a plan like this. Real Alternatives, I'm sure, will sell it to them through Real Alternatives. So they've done this sort of front end- you could frame this as a standing question, which the GE person's going to have a much harder time to show. Why? Why would it be any different for a GE employee? Well, it would- at minimum, they would have- they wouldn't have shown that they already have access to the kind of plan they want. So there's that sort of front end. Now on the issue of what are my religious beliefs and what has the government done to the market, there is a lot of similarity there. So we're not saying that that's not the same. But then the government can come along and say, you know, we can't order insurance companies to- we already have a loan insurance company. We're just saying the government- the only thing left for the government to say, we have a compelling interest to force you to provide this, is the idea that the government doesn't allow any exemptions at all. And that's just literally not true. They do allow exemptions. Okay. Can I ask- your time is up, but can we ask for two minutes? I'd like you to address under the RFRA claim, arguably there's a burden, and Judge Jones found there's a burden. Would you articulate for me why that burden, meaning you subscribe to a plan that makes an option for certain people who want to avail themselves of certain services, and I mean it could be, you know, doctor-assisted suicide. It could be any one of a number of things that I find morally objectionable. Why is that a burden that is substantial? Well, it's a burden because they have a religious belief against participating in recovery. No, you have a moral belief. I mean, no, it's a religious belief, but let's assume it is a burden, and we say Judge Jones found it's a burden. Explain to me why it is substantial. Well, because they were forced to choose between following their religious beliefs and having the benefit of being able to participate in a plan that's consistent with those beliefs. Having a health plan that's consistent with your beliefs is a benefit, that they're being denied, and that's the test I'm assuring you. But how is it inconsistent with their beliefs in that they don't have to avail themselves of these services? It's just a matter of I'm paying to be reimbursed for whatever I want to be reimbursed for. Does this extend to, for instance, the plan that does have doctor-assisted, you know, a doctor would be reimbursed for the services assisting suicide. I mean, where do we draw the line in terms of the ability of these plans to offer certain things that some people might want to avail themselves of? Well, we're not asking you to prohibit plans that offer these things. What we're saying is... Yes, you are. No, respectfully, Your Honor, we're not asking the court to ban an insurance company from offering these either. We're saying if an insurance company is willing to offer a plan without them, and these people don't want them anyway, and it's very important to their religious beliefs to be in a plan that doesn't cover these items. Hobby Lobby said it's no business of the government or the courts to say that they've drawn the wrong line. But that was the provision of these services. The company actually saying, you know, sponsoring, if you will. This is what I am giving you as compared to I'm writing a check. That means I get, you know, coverage. I will be reimbursed for whatever I select these kind of services. It's a very different concept. Well, it's not different from Thomas Church's review board where the man was in a tank factory. He said, I don't want to make a tank truck, but I will roll the metal that we'll send over to the tank factory. And the government said, you can't draw that line. Why would you be okay with rolling the metal and not making the turrets? And the court said, none of our business. And Hobby Lobby said, we agree. You have another question here. No worries. I had a question about standing. I was a little confused about something in the district court opinion as it relates to your clients and standing. So on page 53 over to 50, 54 over to 55 of the district court opinion, the judge seemed to talk about standing. And I was confused because it seemed that he made a finding that there was no standing. And I didn't see anything in the briefing on it, and I wondered whether you could comment on it. He says that the individual plaintiffs offer no evidence that they would be able to obtain acceptable coverage. And he specifically found that the defendant's argument that the plaintiff's RFRA claim would not be redressable, even in the instance that this court were to issue a favorable ruling, to be significantly more persuasive than it was in the first instance, which might be confusing. But then on the next page he says, even if the plaintiffs had conclusively established standing to challenge the requirement that contraceptive services be included in their health care, we are not convinced. And then he goes on to speak about why the substantial burden test hadn't been met. So help me out on whether that is a ruling on standing, and if so, do you have standing? I was slightly confused by that myself, Your Honor, and I came here prepared to discuss that. It sounded to me like the judge said their standing case isn't as strong as the organization's standing case. And then he didn't really bring it home. He just kind of went on and said, well, regardless, he didn't agree with the RFRA claim. I think it would be erroneous to say that our standing case is weaker than Real Alternatives for the simple fact that the same group that Real Alternatives had, they could get a plan that they want. It's exactly the same group that the employees have. If the district court issued an order saying the government is enjoined from penalizing the insurance company or Real Alternatives for giving my individual employees the plan that they want, that's the same plan. So the same plan that proves you can get what you want as an organization is the same plan that the employees have access to a plan. So I didn't understand why the judge said, well, we didn't – I think he was saying we haven't proven we can go out in the individual market and buy that plan. But we have proven we can buy at least one, and it's the one we're giving from our – we're giving it to our employer, and that's still our plan. So I don't know why that proof was sufficient. I didn't understand the basis for that distinction. All right. Okay. Thank you very much, Mr. Bowman. Mr. Salzman. Thank you, Your Honor, and may it please the Court, Joshua Salzman on behalf of the defendants. Could you pick up on the standing issue since we're here? Absolutely, Your Honor. And since you didn't object to standing here. Right. And like Mr. Bowman, I think we read that aspect of the decision as saying that the standing shown was weaker or that it was more doubtful, but since we thought – we went ahead to address the merits. Obviously, standing is a threshold issue under Article 3. So if this Court is interested in standing, I can help elucidate why standing might be lacking here, but we made the judgment not to present the standing argument. I mean, it's hard to argue that it's merely dicta when he says, therefore, we find. Yeah. I think our takeaway from that was that the Court described the standing objection that was raised in the district as considerably stronger in the context of individual employees, but we didn't read it as ultimately a holding of the Court because our judgment was that, for most likely reasons Mr. Bowman articulated, that there probably was standing for the individual employees. We didn't read that argument here. All right. Okay. Thank you. Thanks. Let's stick with the individual employees for a moment, okay? And it was kind of remarkable to me that in your brief, the March for Life case and the Weiland case get barely a mention. Those cases take on your position as it's articulated here under very similar facts. So, you know, why don't you just take a moment and tell us why they're wrong? Why is the March for Life Court wrong when it says that the – and let's start with the substantial burden part, okay? Let's just walk it through. Substantial burden, compelling interest, and least restrictive means. When the Court says there's a substantial burden here because people are put to a Hobson's choice, they either have to participate in a pooled plan that violates their sincerely held religious beliefs, or they have to go without insurance. And that's a substantial burden. Why is that wrong? That's wrong. I think the reasons I thought Judge Rendell was getting at during the opiate portion of the argument, what you have here is a regulation that doesn't directly apply to Mr. McEwen, Mr. Rendell, Mr. Pagata. And all it does is it makes available to them contraceptive products that they're free to the client to get. When you say all it does is, that certainly minimizes their assertion, and that's in fact what the March for Life Court says is that what you've really done is you're taking a shot at their religious belief, which is it's a silly religious belief for you to be worried about having to participate in and pay money into a system that involves the provision of those things. Absolutely not, Your Honor. Well, then what is it? You're taking a shot at their religious beliefs. And I think the key precedent here is the Supreme Court's main case, because there the government did something that everybody seemed to recognize was going to all but make it impossible for this tribe to continue to practice its religion. It was building a big road. So it's got to be that? It's got to be to the level of all but impossible? Oh, no, no. That's not what I'm saying at all, Your Honor. Okay. What I'm saying is Lynn draws an important distinction between direct coercion, a regulation that applies directly to you, and between something that has an incidental effect, even a tremendously significant incident. Hobby Lobby, I think it's footnote 37, doesn't that just take the wind right out of those sails? Hobby Lobby says there's nothing in RFRA that talks about direct versus indirect, that the pressure, I take that to be saying indirect pressure, indirect burdens, can be just as real and just as substantial. Is that not what the court said? No, I don't think that's the right takeaway from Hobby Lobby. Hobby Lobby was the direct object of the regulation. Hobby Lobby wasn't the object of the regulation. That's true. That's true, Mr. Salzman, but you're not answering my question, which is respond to that footnote 37. It's true that the law in Hobby Lobby deals with a direct problem, but the court talks about this in terms of, and I hope I've got the right footnote, yeah, 37, it's on page 2781 in the Supreme Court Reporter, and it's talking about this happens because it affects third parties, et cetera, and the court says nothing in the text of RFRA or its basic purposes supports giving the government an entirely free hand to impose burdens on religious exercises as long as those burdens confer a benefit on other individuals. In other words, I take that to mean directly in response to the exchange Judge Rendell had with Mr. Bowman and the arguments you're making right now, that there's nothing in the text of RFRA that says those kind of burdens aren't real. I read that footnote quite differently, Your Honor. I read that footnote as a rejoinder to a different argument that was made in that case, which was drawing on Cutler v. Wilkinson, the government argued in Hobby Lobby that when a statute is passed to provide a benefit for a third party, so there are a contraceptive available to Hobby Lobby's employees, there would be great problems if your religious objection interfered with the ability of government to convey, to confer benefits on third parties, and Justice Alito rejected that argument in that footnote, but I don't think he was rejecting Lane, which was my opinion. I don't think he's rejecting Lane either. What I think he's rejecting is the idea that indirect burdens are somehow off the table when you come to RFRA. He seems to be saying you can make the burden indirect by saying, oh, we're really not affecting you. We're just giving something to third parties who want it. What's that got to do with you? And he seems to be saying just because you put a third party beneficiary in there doesn't mean you have eliminated the difficulty for the individual. That's not the point. I think you've got to join two things there. It's not that there's just a third party beneficiary or not. The key thing is, is there a direct regulation? Is there, in the words of Lane, direct coercion being applied to the religious objection? Where in the text of RFRA do you find something about direct impingement versus indirect coercion? I find that in the Lane case, Your Honor, which explicitly discusses what takes on the dissent in that case. The dissent in Lane was quite in line with the position Your Honor is describing. And the Lane majority seems to take on the dissent quite directly. And it says, if you look to the free exercise clause, what's prohibited are prohibitions on the free exercise of prohibition. And as a result, incidental effects, those don't count, even if they are tremendously significant. So the effect here, according to Mr. Bowman, is we're forced to pay into, give our dollars to, a pool of money that's going to pay for something we find morally important. And we either do that or we don't have insurance. And your position is, your choice in that instance, that's merely an incidental. The regulation that's being challenged here applies to Blue Cross Blue Shield as the plan issuer. It applies to Real Alternatives, which is an authority for plaintiffs, as the plan sponsor. Now, the downstream effects of that are a constraint of choices available to Mr. Lane, Mr. Bowman, and Mr. McEwen. But they are not themselves direct object of the regulation. Right. So we're back to footnote 37. Apparently. I understand that the issue was vacated, so I'm not going to directly rely on this here. But I would say that this Court's opinion in Geneva College, which was issued after Hobby Lobby, read Hobby Lobby as preserving this aspect of Blue Cross Blue Shield. Sure, and written by a brilliant jurist, but as you just noted, vacated. Absolutely. Okay. Let's look at compelling interest, if my colleagues will allow me. I apologize. Maybe I'm asking too much. But I had a little trouble understanding, because it seemed like it was shifting around a little bit. What state it? What's the compelling interest? So the compelling interest, for purposes of the Ripper claim, is the workable insurance system. And having these group health policies not have individuals coming in and trying to strike out individual aspects of their coverage. Did you argue that before the district court as well? Yes, I did. Because Judge Jones does not articulate that as the compelling interest. It isn't as explicitly discussed, but there are, if you'll bear with me. I mean, he really says, you know, promoting health and gender equity. But in the context of promoting health, that the judge was picking up on arguments raised in the brief, there's a quite explicit discussion of, in Judge Jones' opinion, in the discussion of promoting health, how it would be inconsistent with promoting health, to allow individuals to exercise coverage. But Judge Leon says, you know, you could do it. The government could figure out how to do this, giving certain of these moral concerns. You know, this isn't the least restrictive means. There are other ways. What do you say to that? I think that for precisely the reasons the panel was discussing earlier, the GE hypothetical, the Fortune 500 hypothetical, there are serious problems with allowing individual policyholders to try to get out of individual coverage. Yeah, what's the problem? Because you've never grappled with, and I would like to hear you grapple with, the articulation that the March of Life court, Judge Leon, gives us when he says, this doesn't ask the government to do anything except get out of regulating the insurance market enough to let an insurance company who wants to, if it wants to, to offer this. That doesn't hurt the government. It doesn't hurt anybody. It leaves it to market forces. And if there's an insurance company that thinks, there's an actuarial pool here that I could access, they can do it. What's wrong with that reasoning? Well, first of all, I want to highlight that we only get to this question if there is a substantial burden. I'm with you on that. Gotcha. So answer it. Now, assuming that, nonetheless, we find a substantial burden here, I think that what it relates to is the administrative costs that result. To whom? To whom? To whom? The argument that the court in March for Life said is, the government doesn't have to do anything except say, if you can find a pool of people who've got sincerely held religious beliefs and they want this insurance coverage, you can offer it. That's it. That's it. What is the administrative burden on the U.S. government in a workable insurance system that results from that? I mean, to be clear, the burden isn't falling on the government. The government's interest, in fact, is in having the insurers be able to have this sustainable success, as described, for example, in the Peace for Life decision. And they presumably would make that decision, right, Mr. Saltzman? They would make that decision. They would, but we don't trust them. ...policies that are built around these large bundles. And at the point, in order to keep costs down and to make administration easy, you have these standardized plans that have these large baskets of coverage. Was there evidence before the district court that a system other than this is unworkable? Is there any expert testimony that this is the way it has to be, or else it's just total anarchy? I don't think there was specific evidence in the district court. We do cite in our brief, too, some discussion in the Federal Register about how the system depends on risk avoidance and the participation, but specifically to this question, no, I'm not aware of anything like that. And I'm still trying to understand how, if you leave the question to the market, that creates a problem. I mean, you seem to be saying, we've got this interest and it won't be a workable system, but the market will tell you whether it's workable or not. Because either they'll decide it's workable and they'll offer a plan, or they'll decide it's not workable and they won't offer a plan. So how is the government's interest harmed at all by the solution that Judge Leon proposed in March for Life? Well, we'll think about it in the context of a GE, because I think that's where the interests are clear. So you have individual plaintiffs who are a few employees of GE. They don't want this. They come and they bring a record claim. And as Your Honor was explaining earlier, if these plaintiffs are right, the rights of employees at GE can be no different. They're for religious purposes. Sure. So the way I posed it, Mr. Sossin, was they opt out of the GE plan, and they say, we want to go on the individual market. Just let there be a plan out there for people like us. Why can't there be a plan for people like us? That's it. We're not saying GE's got to do anything. We're not saying the government's got to do anything. Just let us go out to the market and have a plan. But the government says we can't have a plan. That's the RIFRA problem. Answer that. I think that fundamentally the issue is here that if these – I recognize you're – I've said this before. I'm afraid that Your Honor's not – the bottom line here is that in order to keep administrative costs down, it's important to keep these policies with these local governments. So the response to Judge Leon is we, the government, just know that this is a problem. And we don't have to let it go to the market because we know it's unworkable. That's the bottom line. And because we don't want individual employees trying to come into courts and get individual coverages from their policies. I would add, Your Honor – Why is that a problem? Why should it matter to anybody if a handful of employees here or there say, I don't want to be part of that. I'd rather go outside. I mean, people do that all the time. They decline coverage because their spouse has got it or they go someplace else to get it. I can get a better plan on my own. How does that affect the insurance market then? If they do go on the individual market, actually, and Your Honor, they would not qualify because if they were declining minimum essential coverage from their employer, they would not be able to get subsidies. For example, they wouldn't be getting government subsidies on the individual. So there would be some pretty significant costs. Well, suppose that the people that we are putting in this category, hundreds of employees at many companies, all said, you know what, we're willing to take whatever the consequences of the change in market would be. We're willing to take less coverage. We're willing to take poor quality coverage. All of the things that we think would be the parade of horribles in the marketplace. There was an insurance company that says, you know what, we'll take all those people. Does that undercut your argument? I don't think it does, Your Honor. Again, I do not think these plaintiffs have alleged a substantial burden, but even if they had, I think at the point that you have people opting out of minimum essential coverage, the reason that minimum essential coverage was made available was because of the health benefits that Congress found that the savings and the value of the American population in having preventive care available. So the interest really is contraception for everybody. I mean, I think you've gotten to where it seemed like you were before and where the government was in multiples of these cases across the country until it decided to frame it as universally insurance, and that is the real interest of the government is cost-free, contraceptive, made available to anybody who wants it. That's the real interest that's compelling and that drives the government, isn't it? That seems to be what you just said. I think that does bear on the result here. Our understanding was that we didn't think that that one was necessary. It is certainly the interest that we provide on in Geneva College and Zubik and all of those other cases. Because of the somewhat different framing of this case, we presented the compelling interest a little differently. Okay. You mentioned Geneva College, and if you can't answer this question, and this might be unfair in this context, but if you can answer it, I wish you would, Mr. Salzman. It was remanded by Zubik as well as several other cases, and because the government and the plaintiffs in Zubik and in those other cases had said, hey, maybe there is a less restrictive way to deal with this. Let us talk about it. Those talks, can you shed any light on that? Is that still going on? Where does that stand? And if you can't, because they're sensitive at this stage, I certainly understand. I don't mean to put you on the spot. But if you can shed any light on that, I'd be interested. Sure. In the wake of the Zubik remand, things proceeded along two separate tracks. One, as I think plaintiffs in these various cases have disclosed, there have been a couple of meetings between Justice Department officials and counsel for the Zubik plaintiffs. In addition, what the departments did is, in July, they issued what's called a request for information, and they asked the public a number of questions that were out there on whether or not there is, in fact, a more or less restrictive alternative. The comment period was 68, so it closed at the end of September. The departments received 54,000 comments, which are in the process of being approved. And the departments are actively working now to figure out what changes it has made in light of both their conversations with the plaintiffs and especially in light of the RFI comments. And could that affect this case? So there are, as Judge Jordan mentioned before, two similarly situated cases, March, so just one, March for Life and Wyland. The government has put, or agreed to the plaintiffs' consent, put March for Life in abeyance pending the outcome of these proceedings. Yesterday, the government filed an abeyance motion, an opposed abeyance motion in Wyland. So I think we do see some reason why the issues here are linked up to what's going on in those processes and what's going on in the Zubik cases. You're opposing abeyance in Wyland? No, we filed an opposed motion. So you wanted it. You agreed to abeyance in March for Life. You want abeyance in Wyland. Why not here? I think that that question might be better addressed. Better directed at Mr. Butwell, but I will ask him that very thing. Any other questions? Okay. Your Honor, if there are questions about equal protection. No, we've had to brief him on that. Okay, thank you. Thank you very much, Mr. Salzman. Mr. Bowman, it's your time, but I'll steal part of the writing. Why should this court invest time, effort, energy in wrestling with deeply important constitutional and statutory issues that might be materially affected by something that's happening out there in the world in closely related cases? Why should this case not be put in abeyance? I was happy to consent to an abeyance if the government would have allowed us to have our plan in the meantime. That's what we have in March for Life, so I consented to an abeyance in March for Life because we have a dejunction. I said, well, can we at least have the morally acceptable health plan that you took away from us? While the court is in abeyance, and they said no, ultimately it's up to the court. If the court delays, then that's the first decision.  You are not downstream or indirect vis-a-vis that health plan. That's your health plan. The government took away a morally acceptable health plan that my individual clients had. And so for the government to say, oh, this doesn't affect them, they're not directly regulated, it's just indirect. They had a health plan that was morally acceptable to them. Their employer was good with it. Their insurance company was good with it. They took it away. Well, take on the Ling argument, right? You heard it, and you read the briefing, and you folks have been doing a little tour of the country, right? Yes. Meeting each other in different cities and fighting about these important issues. So you know the argument. Just give us the response. When he says Ling tells you that there's a difference between incidental and direct burdens, that's something you need to pay attention to. Why is he wrong? Because in Ling, the government was regulating its own property, and the Native Americans, it wasn't their property. Here, it's my health plan. I had it. I had a health plan. It was morally acceptable to me. The government admitted it does not undermine the government's interest not to give me contraception because I'm, in principle, opposed to it. My employer was okay with it. My insurance company was okay with it. The government forced it away from me morally under the terms that are acceptable to me. That's not indirect. That's my health plan. That's my family's health plan. That's our morality. And the government says it doesn't matter, under interest. In all the cases that the government cites on the other side, they're saying, for example, in the Amos case, this is about employment discrimination. Government has an interest that's advanced when the secular businesses don't engage in employment discrimination. But here, the government admits it does not undermine our interest to exempt these people. And so for the court to simply say, look, the government is going to admit that no interest is advanced by forcing this on a group of people who don't want to in this particular case, then, yeah, we can't treat people unequally in that way. There is evidence in the record that the insurance industry would fall apart. I would suggest, yes, the evidence is we had a plan, and the insurance company would still sell it to us, and no insurance system was falling apart. But there wasn't a comprehensive system that there is now, correct? No, there was. Our plan actually persisted several years into after 2010 when the Affordable Care Act was enacted, because it took a while. And now they're in a new regulation. Because it took a while. So we had it. And religious employers have it now. That's all we want. Let me ask one final thing with indulgence of my colleagues here. This is more of a strategy question, I guess. Your decision to oppose abeyance in Weiland and to oppose abeyance here if it were moved for... That's framed exclusively because... Well, let me ask you. You may be repeating yourself, but why do you think that's not in your client's interest? As opposed to bearing the risk of losing the case, you know? I don't represent the plaintiffs in Weiland. As I understand, the district court in Weiland recently ruled in favor of the plaintiffs. So I don't want to second guess, because I don't know the case. Had I been the attorney there, I would have said, hey, we've got an injunction. You can stay the case as long as you want. That's what we did in March of July. All right. But that's why we did it in March of July. I got it. All right. Thanks very much, Mr. Bowman, Mr. Salzman. Well-argued case. We appreciate the briefing and the argument today. And we'll take the matter under advisement.